J-S58015-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN RE: C.W., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.W. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 652 WDA 2018 |

Appeal from the Order April 6, 2018
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  No. CP-02-AP-102-2017

BEFORE:  OLSON, J., MURRAY, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY OLSON, J.:                    **FILED DECEMBER 07, 2018**

Appellant, J.W. (Father), appeals from the order entered on April 6, 2018 involuntarily terminating his parental rights to C.W. (a female born IN July, 2015) (Child) pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).[1]  Upon review, we affirm.

The trial court summarized the facts and procedural history of this case as follows:

> Child was born to C.L.P. ("Mother") and resided with Mother until Mother's death in a shooting incident on March 11, 2016.  [Father] is named as the [f]ather on [Child's] birth certificate [and] Father signed an [a]cknowledgment of [p]aternity on the date of [Child's] birth.

---

[1]  The order additionally involuntarily terminated the parental rights of another man, D.C., who previously asserted a paternity claim, as well as any putative father to Child.  Neither D.C. nor any putative father is a party to the current appeal or filed a separate appeal.

[Child] initially came to the attention of [the Allegheny County Office of Children and Youth Services (CYF)] after Mother tested positive for marijuana at the time of [Child's] birth. CYF conducted an investigation and opened a case in September, 2016. CYF has remained involved with [Child's] family since that time.

Following [Child's] birth, while she resided with Mother, Father initially remained involved in CYF meetings and home visits, and was often at Mother's residence, although he [did not] reside there, but was in and out of the house. However, on October 13, 2015, Father received a sentence of 15 to 30 months of imprisonment for [possession with intent to deliver a controlled substance.]

On March 11, 201[6], Mother was shot and killed. CYF initially placed [Child] along with her older brother[,] J.W.[,] with their maternal grandmother following Mother's death. In April, 201[6], CYF sought an emergency custody authorization (ECA) because of Mother's death and Father's incarceration. CYF subsequently removed [Child], along with her brother J.W. from maternal grandmother's care and placed them with a maternal aunt. CYF thereafter filed a dependency petition on March 25, 2016 on the grounds that Mother was deceased and Father was still incarcerated at that time. [The trial court] adjudicated [Child] dependent on June 22, 2016, and [Child] subsequently returned to the care of maternal grandmother, where she has resided since.

In February, 2017, while still incarcerated, Father [] contacted CYF by letter in which he stated that he wished to see his daughter upon his release, and that he missed her. CYF's efforts to further communicate with Father while he was incarcerated were unsuccessful. Father did not seek visitation with [Child] while incarcerated. However, he informed CYF by letter that during his imprisonment, he had maintained some phone contact with [Child] while she was in the care of maternal grandmother, until maternal grandmother's phone number changed and he could no longer contact her. Father did not otherwise request visits with [Child] while he was incarcerated.

On July 20, 2017, Father was released from incarceration and placed on probation/parole. Initially, following his release on probation/parole, Father listed his sister's home as his residence. However, he was subsequently ordered to reside in a halfway

house in January, 2018, after violating the conditions of his probation/parole by failing to reside in his designated residence with his sister, and residing instead with his girlfriend.

Father attended his first hearing in this matter on August 9, 2017, following his release from incarceration. Thereafter, CYF began to conduct supervised visits between Father and [Child] beginning on August 10, 2017. CYF arranged a total of [36] visits between Father and [Child]. Of the [36] visits scheduled by CYF, Father attended [23], each of which were approximately two and-a half to three hours long. In January, 2018, [the trial court] granted Father some unsupervised visitation with [Child].

CYF filed a petition for termination of the parental rights of Father on June 20, 2017. [The trial court] conducted a hearing on the petition on April 6, 201[8] and on April 13, 201[8 the trial court] entered an order terminating Father's parental rights. Father filed a [n]otice of [a]ppeal on May 9, 2018 and a [c]oncise [s]tatement of [e]rrors [c]omplained of on [a]ppeal pursuant to Pa.R.A.P. 1925(b) on that same day. [The trial court issued an opinion pursuant to Pa.R.A.P. 1925(a) on June 11, 2018.]

Trial Court Opinion, 6/11/2018, at 2-5 (record citations and footnote omitted).

On appeal, Father presents the following issues for our review:

1. Did the trial court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), and (8)?

2. Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Father's parental rights would best serve the needs and welfare of the child pursuant to 23 Pa.C.S.A. § 2511(b)?

Father's Brief at 6.[2]

_____

[2] Before turning to the merits of this appeal, we first note the following. On August 18, 2017, the trial court appointed KidsVoice as counsel to represent Child as required by 23 Pa.C.S.A. § 2313(a) and our Supreme Court's decision

In his first issue presented, Father contends that the trial court erred by finding CYF presented clear and convincing evidence that he "failed to address relevant goals or whether a continued incapacity exists" under the relevant subsections of 23 Pa.C.S.A. § 2511(a), as alleged in the termination petition. Father's Brief at 16-20. More specifically, in sum, Father avers:

> CYF based much of its argument [in favor of terminating Father's parental rights] on evidence that Father was still in a half-way house and was not in recommended mental health treatment. But there was no testimony that Father poses a physical or physiological risk to [Child]. CYF even admitted that the goal of mental health treatment was something Father needed to do to become a better parent.
>
> Father has remedied any parental incapacity related to his ability to care for [Child] except for housing which may be resolved in the near future. Once he was given a realistic opportunity, Father visited [Child] regularly. Father has done all that he could since his release from prison and it would be contrary to the purpose of establishing and requiring a parent to pursue reunification goals if after doing so the parent is told that his or her efforts are still not good enough.

_____

in **In re Adoption of L.B.M.**, 161 A.3d 172 (Pa. 2017) (plurality). Andrea Spurr, Esquire, an attorney from KidsVoice, represented Child at the termination hearing and agreed that CYF met its burden in providing clear and convincing evidence to terminate Father's parental rights. N.T., 4/6/2018, at 133-134. Upon Father's appeal, Attorney Spurr filed an appellate brief on Child's behalf maintaining that termination of Father's parental rights was proper. Moreover, we recognize that Child was two years and eight months old at the time of the termination proceeding. Our Supreme Court has determined that a three-year-old is too young to express a preference regarding reunification or termination of parental rights and an appointed attorney may simultaneously represent a child's best and legal interests in a contested termination proceeding. **See In re T.S.**, 192 A.3d 1080, 1089-1090 (Pa. 2018). As such, we presume KidsVoice did not have a conflict of interest in advocating for Child's best and legal interests. **Id.**

- 4 -

If any compliance should be reviewed it should respectfully include CYF and the trial court as to whether Father was given a due chance to succeed when Father was never transported from prison for a hearing, Father never had a colloquy with the trial court as to the availability and importance of counsel, Father was not assisted with prison procedures to facilitate visits with [Child], or even provided with the foster mother's new telephone number so Father could maintain contact with [Child]. The failure to reunify could be argued to be the result of these omissions or failures more than any deficiencies alleged to remain with Father after all of Father's efforts.

*Id.* at 18-20.

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. ***In re: R.J.T.***, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. ***Id.***; ***R.I.S***., [36 A.3d 567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. ***Id.***; ***see also Samuel Bassett v. Kia Motors America, Inc.***, 34 A.3d 1, 51 (Pa. 2011); ***Christianson v. Ely***, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. ***Id.***

As we discussed in ***R.J.T.***, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. ***R.J.T.***, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result,

as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. ***In re Adoption of Atencio***, 650 A.2d 1064, 1066 (Pa. 1994).

***In re Adoption of S.P.***, 47 A.3d 817, 826-827 (Pa. 2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. ***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009). Moreover, we have explained, "[t]he standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.' " ***Id.*** (citation omitted). This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of Section 2511(a). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

Section 2511(a) provides, in relevant part, as follows:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\*　　　　　\*　　　　　\*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

- 6 -

*       *       *

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

*       *       *

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511.

The Supreme Court set forth our inquiry under Section 2511(a)(2) as follows:

[Section] 2511(a)(2) provides statutory grounds for termination of parental rights where it is demonstrated by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." ...

[Our Supreme] Court has addressed incapacity sufficient for termination under § 2511(a)(2):

A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when

- 7 -

> termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

*In re Adoption of S.P.*, 47 A.3d at 827.

Moreover, while incarceration alone cannot be grounds for termination of parental rights, our Supreme Court has held:

> A parent's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment. Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration. Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the child. Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.
>
> *          *          *
>
> [I]ncarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied.

*Id.* at 828 (internal citations omitted).

Additionally, this Court has long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.* at 340. It is well-settled that "we will not toll

the well-being and permanency of [a child] indefinitely." ***In re Adoption of***

***C.L.G.***, 956 A.2d 999, 1007 (Pa. Super. 2008), *citing **In re Z.S.W.***, 946 A.2d

726, 732 (Pa. Super. 2008) (noting that a child's life "simply cannot be put on

hold in the hope that [a parent] will summon the ability to handle the

responsibilities of parenting.").

In this case, the trial court determined:

At the April 6, 2018 hearing on CYF's petition for involuntary termination of parental rights, [] CYF supervisor David Sprague, [] credibly and consistently testified that [Child] had no face-to-face contact with Father from the time of his incarceration in or around October 2015, at which time [Child] was approximately three months of age, until after his release on July 20, 2017, at which time [Child] was two years of age. In addition, Father had limited, if any, telephone or other contact with [Child] during the extended period of incarceration. This absence of interaction impaired the development of a meaningful bond between Father and [Child] who has never resided in Father's care since the time of her birth. CYF presented credible and consistent testimony that Father has never engaged in long-term care of [Child], who has resided with maternal grandmother since shortly after Mother's death and for the majority of [Child's] life – during which time Father did not maintain regular contact.

Father's absence from [Child's] life has been the result, in part, of his failure to commit to parenting and make appropriate decisions in [C]hild's best interests. His repeated incarcerations and most recent placement in a halfway house after he failed to remain at his designated residence following his release from jail on probation or parole, is further evidence of his ongoing failure to prioritize parenting. Rather, it reflects a continuation of conduct and decision making that prevents Father from providing [Child] with stability and consistency – as evidenced, for example, by his inability to progress to a position that would enable him to secure appropriate housing in which to care for [Child]. Father's failure to give priority to parenting and to provide a stable, secure environment for his child, has caused [her] to be without essential

parental care, control, or subsistence necessary for her physical or mental well-being.

[The trial court] acknowledge[d] that Father was granted visitation with [Child] following his release from imprisonment, and that he attended 23 visits with [C]hild. However, although he attended scheduled visits, Father's conduct indicates a lack of the appropriate level of responsibility and consistency necessary for him to provide parental care to [Child] in a home setting. In reaching this determination, [the trial court] found credible and persuasive the testimony of Dr. [Beth] Bliss, a licensed psychologist who conducted an evaluation of Father on January 12, 2018. Dr. Bliss diagnosed Father as suffering from anti-social personality disorder that interferes with his ability to behave in a consistent, responsible manner, and appropriately control his impulses in order to effectively parent [Child]. Dr. Bliss reported that Father's mental health condition interferes with his ability to provide stable and consistent parenting. This testimony by Dr. Bliss is substantiated by the fact that Father has a lengthy criminal history[fn] resulting in his most recent [incarceration] during [Child's] infancy which led her being without his parental care. Father continues to demonstrate an inability to regulate his own conduct and maintain stability in an independent setting outside of confinement or a halfway house. His poor decision making and inability to progress [] have hampered his ability to provide [Child] with secure and consistent parental care and support.

Based on the foregoing, [the trial court] concluded that CYF presented evidence sufficient to demonstrate that grounds for termination of parental rights exist as to Father. The evidence and testimony presented [] indicate that the conditions and causes of the incapacity or refusal of Father to provide [Child] with parental care cannot and will not be remedied by Father, and continue to occur.

---

[fn] At the [termination] hearing, CYF presented evidence of Father's criminal history, as follows: On August 17, 2009[,] Father received a sentence of [two] years of probation plus fines, after he entered a plea of guilty to one count of possession of a controlled substance. On July 7, 2011, Father received a sentence of 9 months of probation for one count of possession of a controlled substance. On October 13, 2015, Father was found guilty of possession of a controlled substance with intent to deliver, possession of a controlled substance, possession of

marijuana, use/possession of drug paraphernalia, endangering the welfare of children, tampering with evidence, and conspiracy. Father was sentenced to 15 to 30 months of imprisonment, reduced to 11 months and [seven] days followed by [four] years of probation under the Recidivism Risk Reduction Incentive Act. On January 28, 2016, Father was found guilty of defiant trespass and disorderly conduct and subsequently sentenced to a term of imprisonment of nine days.

Trial Court Opinion, 6/11/2018, at 7-9 (record citations omitted).

Upon careful review of the record and applicable law, we conclude that the trial court's decision to terminate the parental rights of Father under Section 2511(a)(2) is supported by competent, clear and convincing evidence. In this case, Child was born in July, 2015. She was two years and nine months old at the time of the termination hearing on April 6, 2018. Of that time, Father was incarcerated for one year and nine months. It was proper for the trial court to consider Father's incarceration in assessing whether he was incapable of caring or refused to care for Child.

Additionally, we reject Father's suggestion that he was not assisted with prison procedures to facilitate visits with Child or provided with the foster mother's new telephone number. Father was incarcerated in October 2015, but waited until February 2017 to contact CYF by letter, requesting visitation after he was to be released. N.T., 4/6/2018, at 23-24. Father never requested visitation with Child while he was imprisoned nor did he take steps to remain in contact with Child. *Id.* at 24. He also admitted to Dr. Bliss that he did not talk to prison officials about the procedure for visitation. *Id.* at 84. Based on the foregoing, we conclude that the trial court properly considered

the fact that Father made minimal efforts from prison and did not utilize his resources to continue a close relationship with Child. He simply did not exercise reasonable firmness in declining to yield to obstacles for reunification with Child.

Moreover, in early January 2018, after he was released from prison, Father violated the terms of his probation/parole and moved into a halfway house. On January 28, 2016, Father was found guilty of defiant trespass and disorderly conduct and sentenced to nine days of incarceration. CYF presented evidence of Father's extensive criminal record and Dr. Bliss testified that Father engages in a "persuasive pattern of not following the laws or rules." *Id.* at 86. Thus, we reject Father's contention that the trial court relied almost exclusively on his potential mental health issues and his residence in a halfway house. Instead, the trial court determined that the totality of circumstances, including engaging in continued misconduct and violating the terms of his probation/parole, demonstrated Father's incapacity or refusal to properly parent.

Finally, Father concedes that he has not obtained appropriate housing for Child. His claim that he will be able do so in the near future, after failing to do so for an extended period, rings hollow. We simply may not toll the well-being and permanency of Child indefinitely, because Father does not put Child's needs before his own. Accordingly, we find no abuse of discretion in the trial court's involuntary termination of Father's parental rights pursuant to Section 2511(a)(2). Because we may affirm the trial court's decision

regarding the termination of Father's parental rights with regard to any one subsection of Section 2511(a), we need not address the other statutory sections proffered by CYF.

In his second issue presented, Father argues that the trial court erred in finding that CYF presented clear and convincing evidence that termination of his parental rights would best meet the developmental, physical, and emotional needs and welfare of Child, pursuant to 23 Pa.C.S.A. § 2511(b). Father's Brief at 20-22. Father maintains that "Dr. Beth Bliss, a clinical psychologist called as an expert witness by CYF, noted that without performing an interactional [observation] of Father and [Child] that she could not address the [] issue[]." *Id.* at 21. Father contends that although expert testimony is not necessary for a Section 2511(b) assessment, there was no "testimony as to the emotional effect that termination will have upon [Child] which compelled the trial court to either speculate or rely upon unclear testimony which cannot support a determination of the needs and welfare [of Child] as required under § 2511(b)." *Id.* at 22.

This Court has stated that the focus in terminating parental rights under Section 2511(a) is on the parent, but it is on the child pursuant to Section 2511(b). *See In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*). In reviewing the evidence in support of termination under Section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.

§ 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M*., 53 A.3d 781, 791 (Pa. Super. 2012). *In In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances ... where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child." *In re K.Z.S.*, 946 A.2d 753, 762 (Pa. Super. 2008).

A parent's neglect is likewise a relevant part of this analysis:

[C]oncluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect[], is able to sift through the emotional wreckage and completely disavow a parent ... Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the

- 14 -

development of the child and [her] mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted).

This Court may affirm the involuntary termination of parental rights despite the existence of some bond, where placement would be contrary to her safety or best interests. *See In re K.Z.S.*, 946 A.2d 753, 763 (Pa. Super. 2008). "The trial court should also examine the intangibles such as the love, comfort, security, and stability the child might have with the foster parent." *Id.* "Another consideration is the importance of continuity of relationships to the child and whether the parent-child bond, if it exists, can be severed without detrimental effects on the child." *Id.* Accordingly, "a parent's basic constitutional right to the custody and rearing of ... [his] child is converted, upon the failure to fulfill ... [his] parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted).

On this issue, the trial court opined:

In terminating Father's parental rights, [the trial court] considered the developmental, physical and emotional needs of [Child] pursuant to 23 Pa.C.S.A. § 2511(b). In so doing, [the trial court] determined that termination was warranted in light of the impeded development of any meaningful, consistent relationship and bond between Father and [Child], from her infancy until August, 2017 when supervised visitation between Father and [Child] began. In addition[,] evidence and testimony presented at the hearing indicated that [Child] displayed an emotional bond to maternal grandmother to whom she is attached. Moreover, maternal

- 15 -

> grandmother effectively provides for [Child's] physical, emotional and developmental needs and welfare. CYF presented credible testimony that [Child] has bonded with maternal grandmother, that [Child] is doing well in her placement, and that maternal grandmother engages and interacts with [Child] in an appropriate manner.

Trial Court Opinion, 6/11/2018, at 9-10 (record citations omitted).

Upon review, we agree with the trial court's assessment. CYF presented the testimony of a caseworker who stated that Child has an emotional bond and attachment with her maternal grandmother. N.T., 4/6/2018, at 72. Child also has a very close relationship with her older brother, who also resides with maternal grandmother, and he is very protective of Child. *Id.* at 73. In their home, maternal grandmother interacts with the children with developmentally appropriate toys and books. *Id.* at 73, 76-77. Child does not speak about Father. *Id.* at 77.

The record reveals that Dr. Bliss was not able to conduct an interactional observation of Father with Child. *Id.* at 82. Dr. Bliss scheduled appointments three times, but it was never completed. *Id.* Father was late the first time and Child was sent home before it could be conducted. *Id.* Child was sick for the second scheduled observation and maternal grandmother cancelled the appointment. *Id.* Father did not show for the third scheduled interactional observation. *Id.* However, as stated above, an evaluation was not legally required. Moreover, based upon background information provided by CYF, a direct interview with Father, and her expertise and experience, Dr. Bliss opined that "the likelihood of [Child] having a bond or attachment from the first three months of her life and maintaining that bond or attachment despite

no contact at all with someone until she was two and a half is extremely unlikely." *Id.* at 102. Dr. Bliss further opined that it was also extremely unlikely Child developed a bond with Father during their supervised visits after Father's incarceration or that severing their relationship would be detrimental to Child. *Id.*

Here, there was clear and convincing evidence that the involuntary termination of Father's parental rights was proper under Section 2511(b). The trial court gave primary consideration to Child's developmental, physical and emotional needs and welfare. Despite the existence of some relationship with Father, Child's placement with him would be contrary to her safety or best interests. Moreover, the trial court appropriately considered Child's current placement and her bond and attachment to her maternal grandmother and older brother. There was clear and convincing evidence that maternal grandmother has met all of Child's needs, including providing love, comfort, security, and stability for her. Whereas, the record reveals that Father has not met these needs. As such, we discern no abuse of discretion in terminating Father's parental rights under 23 Pa.C.S.A. § 2511(b) and Father's second issue fails. For all of the foregoing reasons, we hold that the trial court did not err in terminating Father's parental rights.

Order affirmed.

Judgment Entered.

- 17 -

_____

Joseph D. Seletyn, Esq.
Prothonotary


Date:  12/7/2018